COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Malveaux, Friedman and Lorish
Argued at Alexandria, Virginia


DEREK WADE GINEVAN

v.        Record No. 1765-23-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE FRANK K. FRIEDMAN
DECEMBER 17, 2024


FROM THE CIRCUIT COURT OF FREDERICK COUNTY
William W. Eldridge, IV, Judge

Jason E. Ransom (Ransom/Silvester, PLC, on brief), for appellant.

Anna M. Hughes, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


This appeal considers whether the plain text of the United States Constitution extends the right to possess firearms to those adjudicated to be violent felons—and, if it does, whether the Commonwealth of Virginia has demonstrated that its legislative effort to limit violent felons' access to such weapons is consistent with this Nation's historical tradition of firearm regulation.

Derek Wade Ginevan challenges the constitutionality of Code § 18.2-308.2, claiming it violates the Second Amendment by restricting his right to possess a firearm based on his prior convictions. Ginevan was indicted for possessing a firearm as a convicted felon. After the circuit court denied his motion to dismiss, Ginevan entered a conditional plea preserving his right to appeal the Second Amendment question. We conclude that the statute, as applied to Ginevan, is constitutional, consistent with *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024); accordingly, we hold that Ginevan's constitutional challenge lacks merit and we affirm the circuit court's decision.

BACKGROUND

Ginevan's prior felony convictions[1]

In 2012, Ginevan was convicted in the Circuit Court of Frederick County of felony possession with intent to distribute a Schedule I/II controlled substance in violation of Code § 18.2-248. In 2013, 2014, and 2015, Ginevan was convicted of felony probation violations, in violation of Code § 19.2-306. In 2018, Ginevan was convicted of the felony of obtaining money by false pretenses in violation of Code § 18.2-178. Also in 2018, Ginevan was convicted of the felony of possession of ammunition by a convicted felon in violation of Code § 18.2-308.2.[2] A felony

---

[1] The only portions of the record specifying Ginevan's prior felony convictions are a checklist for bail determination prepared in the general district court and the Commonwealth's statement of facts in its opposition to Ginevan's motion to dismiss. The Commonwealth filed a notice of intent to introduce evidence of those convictions but never did so because Ginevan pleaded guilty. Ginevan's opening brief on appeal admits that he had been previously convicted of possessing ammunition as a convicted felon.

[2] Code § 18.2-308.2 states in pertinent part:

A. It shall be unlawful for (i) any person who has been convicted of a felony . . . to knowingly and intentionally possess or transport any firearm or ammunition for a firearm, any stun weapon as defined by § 18.2-308.1, or any explosive material, or to knowingly and intentionally carry about his person, hidden from common observation, any weapon described in subsection A of § 18.2-308. However, such person may possess in his residence or the curtilage thereof a stun weapon as defined by § 18.2-308.1. Any person who violates this section shall be guilty of a Class 6 felony. However, any person who violates this section by knowingly and intentionally possessing or transporting any firearm and who was previously convicted of a violent felony as defined in § 17.1-805 shall be sentenced to a mandatory minimum term of imprisonment of five years. Any person who violates this section by knowingly and intentionally possessing or transporting any firearm and who was previously convicted of any other felony within the prior 10 years shall be sentenced to a mandatory minimum term of imprisonment of two years. The mandatory minimum terms of imprisonment prescribed for violations of this section shall be served consecutively with any other sentence.

- 2 -

violation of Code § 18.2-308.2 is considered a violent felony under Code § 17.1-805(C) ("For purposes of this chapter, violent felony offenses shall include any . . . violation of § 18.2-308.2 . . . .").

The incident leading to Ginevan's arrest in the current case

On January 24, 2023, police officers were dispatched to a possible domestic disturbance in Frederick County, Virginia. When they arrived, officers observed Ginevan and a woman; the woman immediately advised the officers that Ginevan pointed a shotgun at her. Ginevan admitted that there was a gun in his possession but denied pointing it at the woman. Ginevan claimed that he felt threatened by the woman's statements and had possession of the firearm for personal safety. Ginevan also admitted that he was a convicted felon, a claim which the officers verified. Ginevan was subsequently arrested and later indicted for possession of a firearm by a felon, in violation of Code § 18.2-308.2.

Ginevan's pre-trial motion and the circuit court's ruling

Ginevan filed a pre-trial motion to dismiss the indictment, arguing that Code § 18.2-308.2 violates the Second Amendment and the Fourteenth Amendment. In his motion, Ginevan argued that the United States Supreme Court's opinions *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen*, 597 U.S. 1, as well as the Second Amendment's plain text, provide Ginevan the right to possess a firearm, despite his felony convictions. Ginevan suggested that even though *Heller* and subsequent decisions state that "law-abiding, responsible citizens" enjoy gun rights, the text of the Constitution and the Second Amendment go further; he asserted that "'the people,' as used throughout the Constitution, unambiguously refers to all members of the political community, not an unspecified subset." (quoting *Heller*, 554 U.S. at 580). Ginevan contended that *Heller* stands for the proposition that "the Second Amendment right . . . presumptively belongs to all Americans." (quoting *Heller*, 554 U.S. at 581). Ginevan supported his argument by asserting that the

- 3 -

"law-abiding, responsible citizens" language in *Heller*, 554 U.S. at 625, was merely dicta and that the language "is as expansive as it is vague."

After asserting that he should be considered part of "the people" for purposes of the Second Amendment, Ginevan argued that "the Commonwealth must prove that she can strip him of his right to keep and bear arms." Relying on *Bruen*, Ginevan maintained that the Commonwealth could not meet that burden because Code § 18.2-308.2 is inconsistent "with our Nation's historical tradition of firearm regulation." To support that argument, Ginevan noted that the federal law prohibiting all felons from possessing firearms was not enacted until 1961, and prior to that "[t]he earliest version of a federal statute, the Firearms Act of 1938, applied only to felons convicted of murder, rape, kidnapping, and burglary." Ginevan argued that both statutes were enacted "long after the period . . . *Bruen* told courts to consider[,]" which coincides with the enactment of the Second and Fourteenth Amendments. Thus, Ginevan concluded, "[t]he federal laws enacted in 1938 and 1961 have no longstanding analogue in our national history and tradition of firearm regulation."

The Commonwealth responded, arguing that "[t]here is significant historical precedent for prohibiting violent individuals from possessing weapons." The Commonwealth noted "[a]n examination of English regulations and laws prior to the revolution suggest that disarming violent individuals was even then a long-settled tradition." As summarized by the Commonwealth, "[t]he historical record makes clear that the nation's historical tradition of firearm regulation clearly and strongly embraces prohibiting violent or dangerous individuals from possessing firearms."

The circuit court heard oral argument on Ginevan's motion and denied it. In rejecting Ginevan's arguments, the circuit court found "that the plain text of the Second Amendment does not apply to convicted violent felons. Thus, the circuit court determined that Ginevan's challenge failed as to the first prong of the *Bruen* analysis. Even so, the court went on to explain that Ginevan's

- 4 -

challenge also failed the second prong because "as applied to a violent felon this nation's historical traditions regarding firearms regulations support prohibiting violent felons from possessing firearms." The court relied on "the statements and rules of the Supreme Court in *Bruen*, *McDonald*, and *Heller*, including the dicta" and the "persuasive authority of the Federal District Courts in the Fourth Circuit." The court memorialized its oral ruling in a written order.

Following the court's ruling, Ginevan entered conditional *Alford* pleas to the charges of possession of a firearm by a convicted felon and destruction of property. *North Carolina v. Alford*, 400 U.S. 25 (1990). The circuit court sentenced Ginevan to imprisonment for five years, with two of those years suspended. This appeal followed.

ANALYSIS

I. The Changing Landscape of Second Amendment Analysis

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court struck down a District of Columbia law prohibiting the private possession of handguns in the home. 554 U.S. at 570. In reaching that conclusion, the Court recognized that the Second Amendment protected "the right of *law-abiding*, *responsible* citizens to use arms in defense of hearth and home." *Id.* at 635 (emphasis added). The Court was careful to clarify that its holding was not without limit, writing, "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" as well as prohibitions on carrying weapons in "sensitive places." *Id.* at 626. A footnote directly following this disclaimer noted that "these presumptively lawful regulatory measures" are merely examples and are not intended to be an exhaustive list of permissible regulations. *Id.* at 626-27 n 26.

- 5 -

Just two years later, the Supreme Court held "that the Second Amendment right is fully applicable to the States" through the Due Process Clause of the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 744 (2010) (plurality opinion). In that same opinion, the Court made clear that the holding in *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons[.]'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626).

### A. *Bruen* Overturns the Means-End Scrutiny Applied by Federal Courts post-*Heller*

After *Heller*, federal courts throughout the country implemented a two-step approach to analyzing Second Amendment challenges, ending with the application of what came to be known as "means-end" scrutiny. *Bruen*, 597 U.S. at 17 ("Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."); *see also United States v. Riley*, 635 F. Supp. 3d 411, 420 n.5 (E.D. Va. 2022) (collecting cases). The Supreme Court, in *Bruen*, 597 U.S. at 17, overturned this approach and determined that while the federal circuit courts' first step was consistent with *Heller*, 554 U.S. 570, the second step, applying the means-end scrutiny, was both faulty and inconsistent with *Heller*'s jurisprudence.

The Supreme Court clarified the test in *Bruen*, stating definitively,

> [W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 17 (quoting *Konigsberg* v. *State Bar of Cal.*, 366 U. S. 36, 50 n.10 (1961)). In *Bruen*, at step one, the Court essentially asked three questions to resolve whether the plain text of the Second

Amendment "covers an individual's conduct[.]" *Id.* at 31-32. Those questions boil down to: 1) whether the defendant/petitioner is part of "the people whom the Second Amendment protects"; 2) whether the weapon regulated by the challenged statute or regulation is in common use for lawful purposes; and 3) whether the Second Amendment protects the defendant's/petitioner's "proposed course of conduct." *Id.* (analyzing the three questions in the context of the facts of that case). Under *Bruen*'s textual analysis, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Then, under the second prong of the *Bruen* analysis, if the government wishes to regulate presumptively protected conduct, it must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

*Bruen* dealt with a New York statute that required a citizen who wanted to carry a firearm outside his home to obtain a license to "have and carry" the concealed weapon, upon proof that "proper cause exists" for doing so. *Id.* at 11-12. Proper cause required a demonstration of "special need for self-protection" distinguishable from that of the general community. *Id.* at 12 (quoting *In re Klenosky*, 75 App. Div. 2d 793 (N.Y. 1980)). Both petitioners in *Bruen* had been denied the license. *Id.* at 15-16. Importantly, in *Bruen*, there was no dispute that the petitioners were "two ordinary, law-abiding, adult citizens," and, thus, were among "'the people' whom the Second Amendment protects." *Id.* at 31-32. Nor was there any dispute that the weapons at issue, handguns, "are weapons 'in common use' today for self-defense." *Id.* at 32 (quoting *Heller*, 554 U.S. at 627).[3] The Court thus spent the majority of its first-step analysis on the third question, "whether the plain text of the Second Amendment protects [petitioners'] proposed course of conduct[.]" *Id.* at 32.

---

[3] By corollary, possession of a sawed-off shotgun, fully automatic firearm, or any other less common weapon could yield a different outcome. *See, e.g.*, *United States v. Price*, 111 F.4th 392 (4th Cir. 2024) (finding that there was no common-sense reason for a law-abiding citizen to want to use a firearm with an obliterated serial number for self-defense).

Ultimately, the Court determined that the conduct—carrying handguns publicly for self-defense—was protected by the Second Amendment. *Id.* at 33.

Then having determined that the Second Amendment's plain text covered the petitioners' conduct, the Supreme Court in *Bruen* moved to the second prong of the analysis and determined that the government failed to meet its burden of proving that state laws which required individuals to show a "special need" for carrying a firearm satisfied the Second Amendment. *Id.* at 70.

Although *Bruen* conclusively rejected the means-end balancing test, the opinion never undermined the presumptive lawfulness of firearm restrictions for felons as pronounced in *Heller*, 554 U.S. at 626. *See Rahimi*, 144 S. Ct. at 1902 (reiterating that "[O]ur opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" (quoting *Heller*, 554 U.S. at 626-27 n.26)). In fact, the entire analysis in *Bruen* centered on the rights of two citizens whom the majority emphasized repeatedly were "law-abiding[.]" *Id.*

B. The Supreme Court Reaffirms the *Bruen* Test in *Rahimi*, Upholding the Constitutionality of Firearm Bans Imposed on Those Posing a Credible Threat and Subject to a Restraining Order

After *Bruen*, the Supreme Court was faced with a challenge to 18 U.S.C. § 922(g)(8)—"[a] federal statute prohibit[ing] an individual subject to a domestic violence restraining order from possessing a firearm"—and whether that statute could be enforced against a citizen subject to the restraining order "consistent with the Second Amendment." *Id.* at 1894. In that case, Rahimi "met with his girlfriend C.M., for lunch in a parking lot[,]" at which point the two began arguing and "Rahimi became enraged." *Id.* C.M. attempted to leave and "Rahimi grabbed her by the wrist, dragged her back to his car, and shoved her in, causing her to strike her head against the dashboard." *Id.* at 1894-95. Rahimi noticed a bystander witnessing the interaction and retrieved a gun from

under the passenger seat, at which point C.M. attempted to flee and Rahimi fired his gun at C.M. as she fled. *Id.* at 1895.

Due to this altercation, C.M. sought a restraining order. *Id.* "On February 5, 2020, a state court in Tarrant County, Texas, issued a restraining order against [Rahimi]." *Id.* "[T]he order prohibited Rahimi from threatening C.M. or her family for two years" and "suspended Rahimi's gun license for two years." *Id.* In May 2020, "Rahimi violated the order by approaching C.M.'s home at night. He also began contacting her through several social media accounts." *Id.* In November 2020, "Rahimi threatened a different woman with a gun, resulting in a charge for aggravated assault with a deadly weapon." *Id.* "And while Rahimi was under arrest for that assault, the Texas police identified him as the suspect in a spate of at least five additional shootings." *Id.* The police eventually "obtained a warrant to search Rahimi's residence. There they discovered a pistol, a rifle, ammunition—and a copy of the restraining order." *Id.* "Rahimi was indicted on one count of possessing a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. §922(g)(8)." *Id.*

Rahimi moved to dismiss the indictment, claiming 18 U.S.C. § 922(g)(8) "violated on its face the Second Amendment right to keep and bear arms." *Id.* at 1896. Applying the analysis from *Bruen*, the Supreme Court rejected Rahimi's claims, stating:

> When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect. Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms. As applied to the facts of this case, Section 922(g)(8) fits comfortably within this tradition.

*Id.* at 1896-97. The Court noted that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition." *Id.* at 1898 (citing *Bruen*, 597 U.S. at 26-31). The Court went on to clarify that "[a]

- 9 -

court must ascertain whether a challenged law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (second alteration in original) (quoting *Bruen*, 597 U.S. at 29 & n.7). Furthermore, "[w]hy and how the regulation burdens the right are central to this inquiry." *Id.*

In *Rahimi*, the Court stressed that the restraining order at issue contained "a finding that an individual posed a credible threat to the physical safety of an intimate partner" and that the Government offered "ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id.* at 1896, 1898. In its opinion, the Court analogized the restraining order in *Rahimi* to several other historically similar laws,[4] noting that "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* at 1898. Notably, Rahimi, at the time of his offenses, was not a convicted felon, but nonetheless presented a credible threat of physical harm. *Id.* at 1895.

Thus, at this juncture, the leading Supreme Court cases dealing with gun restrictions have involved non-felons' attempts to possess guns. In *Heller* and *Bruen*, "law-abiding, responsible citizens" successfully challenged limits on their right to possess and carry a gun. Although *Rahimi* was not a convicted felon, he posed an inherent danger to the community; accordingly, restrictions on his gun rights were upheld (under the historical prong of the *Bruen* test). *Id.* at 1896, 1898.

---

[4] *See generally Rahimi*, 144 S. Ct. at 1899-1901.

II. A Review of Virginia Second Amendment Cases pre-*Bruen*

After the *Heller* and *McDonald* framework was laid, Virginia's appellate courts followed the common view that some restrictions on gun rights are presumptively reasonable.[5] The Supreme Court of Virginia, consistent with *Heller*, held that the Second Amendment allows the government to prohibit the carrying of firearms in "sensitive places," including schools and government buildings. *DeGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 134-35 (2011). Specifically, the Court in *DeGiacinto* considered whether George Mason University could lawfully regulate possession of weapons on its campus. *Id.* at 130. The Court ultimately found that restrictions on "the carrying of firearms in sensitive places, such as schools and government buildings[,]" are presumptively legal and that George Mason University's regulation was "tailored, restricting weapons only in those places where people congregate and are most vulnerable—inside campus buildings and at campus events." *Id.* at 136. The Court found the regulation, as applied to a campus visitor, was lawful and did not violate the Second Amendment. *Id.* at 137. This outcome is clearly consistent with *Heller*'s pronouncement that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]" *DiGiacinto*, 281 Va. at 134 (quoting *Heller*, 554 U.S. at 625-26).[6]

---

[5] Prior to *Heller*, this Court, in an unpublished opinion, considered whether Code § 18.2-308.2—the statute at issue in this case—violates the Second Amendment, and determined that it did not. *Parham v. Commonwealth*, No. 2876-95-2, slip op. at 5 (Va. Ct. App. Dec. 3, 1996).

[6] This Court also upheld Code § 18.2-308.2(A)(iii)'s temporary ban on non-violent juveniles who have been adjudicated for acts that would be felonies if committed by adults, emphasizing that this holding was consistent with existing pronouncements that felon-in-possession bans are presumptively valid. *Prekker v. Commonwealth*, 66 Va. App. 103, 112-13 (2016), *overruled in part on other grounds*, *Jennings v. Commonwealth*, ___ Va. App. ___ (Dec. 3, 2024). In *Prekker*, the Court reasoned that it must defer to precedents from both the Supreme Court of Virginia and the Supreme Court of the United States, which have recognized felon-in-possession bans as presumptively valid. *Id.* at 117 n.8.

III.  Ginevan's Second Amendment Challenge.

Relying heavily on *Bruen*, Ginevan argues on appeal that the circuit court erred in not dismissing the indictment charging him with being a felon in possession of a firearm because his conduct was protected under the Second Amendment.[7]  As we analyze Ginevan's claims, we find that our course is well-charted—even if we are asked to address a question of first impression in Virginia under the post-*Bruen-Rahimi* framework.

This Court reviews arguments that a defendant's constitutional rights have been violated de novo.  *Walker v. Commonwealth*, 302 Va. 304, 314 (2023).  Challenging an enactment of the General Assembly is a "daunting task," as "all actions of the General Assembly are presumed to be constitutional."  *Montgomery Cnty. v. Va. Dep't of Rail & Pub. Transp.*, 282 Va. 422, 435 (2011).  In fact, "there is no stronger presumption known to the law."  *Id.*  Accordingly, a court may "not invalidate a statute unless that statute clearly violates a provision of the United States or Virginia Constitutions," and "every reasonable doubt regarding the constitutionality of a legislative enactment must be resolved in favor of its validity."  *Marshall v. N. Va. Transp. Auth.*, 275 Va. 419, 427-28 (2008).  It makes sense, then, that "the burden to show the constitutional defect is on the challenger."  *Gray v. Commonwealth*, 30 Va. App. 725, 732 (1999).[8]

---

[7] Ginevan's sole assignment of error includes catch-all language which, on its face, includes a facial challenge to Code § 18.2-308.2, as well as a challenge as applied to him.  Ginevan, however, fails to make an argument in his brief regarding the facial challenge to Code § 18.2-308.2.  And, at oral argument, Ginevan conceded that his argument was an as-applied challenge only.  Oral argument recording at 6:20-6:37.

[8] It merits mention that the Constitution of Virginia also protects the right to bear arms.  It states:

> That a well regulated militia, composed of the body of the people,
> trained to arms, is the proper, natural, and safe defense of a free
> state, therefore, the right of the people to keep and bear arms shall
> not be infringed; that standing armies, in time of peace, should be
> avoided as dangerous to liberty; and that in all cases the military

A. *Bruen* modifies Prior Second Amendment Jurisprudence

Ginevan argues that "*Bruen* conflicts with *Heller*" and, thus, prior case law relying on *Heller* is unreliable. The Commonwealth responds that "[n]othing in *Bruen* purported to overrule or even undermine *Heller*'s statement that felon-in-possession laws are presumptively valid." We agree with Ginevan that *Bruen* significantly altered the analysis applied under *Heller*'s progeny— *Bruen* reconstructed the test that courts are instructed to use in determining whether a regulation violates the Second Amendment, flatly rejecting the "means-ends" analysis that developed widely after *Heller*. But we also agree with the Commonwealth that nothing in *Bruen* explicitly overturned *Heller*'s pronouncement that felon-in-possession restrictions are presumptively valid.[9]

In this case, we must apply the test outlined in *Bruen* and further clarified in *Rahimi*. Under this framework, first, we must determine whether the plain text of the Second Amendment covers Ginevan's conduct by answering whether Ginevan is part of "'the people' whom the Second Amendment protects."[10] *Bruen*, 597 U.S. at 31-32. If we find that Ginevan is covered by the text of the Second Amendment, we must then determine whether the Commonwealth has met its burden in "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. Ginevan must prevail on both prongs in order to establish that Code § 18.2-308.2 is unconstitutional. While the "textual" analysis in this

---

should be under strict subordination to, and governed by, the civil power.

Va. Const. art. I, § 13. Here, Ginevan relies exclusively on the Second Amendment.

[9] Indeed, the majority opinion in *Bruen* embraced the phrase "law-abiding" eleven times, revealing no clear break with the idea that restrictions on felons were presumptively reasonable.

[10] There is no dispute between the parties as to the two other questions, i.e., whether the weapon Ginevan used is in common use for lawful purposes; and whether the Second Amendment protects Ginevan's proposed course of conduct—using that weapon for self-defense. *Bruen*, 597 U.S. at 31-32. Thus, our focus at this stage in the analysis will be whether Ginevan is part of "'the people' whom the Second Amendment protects." *Id.*

rubric can be thorny, the historical analysis is rather clear cut—and, under the guidance of history, Ginevan's claims fail.

### B. The First Prong of the *Bruen* Analysis: Who Falls Within "the people"?

In whole, the Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II.[11] Ginevan asserts that his right to self-protection, even as a convicted felon, is covered by the plain text of the Second Amendment. The Commonwealth argues that people who have been convicted of felonies are not considered "the people" for purposes of Second Amendment protections because they are not law-abiding citizens, thus, Ginevan's conduct is not protected by the Second Amendment.

#### 1. The Dueling Focus Between "Law-Abiding" Citizens and "Dangerousness" in the Case Law

After *Heller* confirmed the "right of law-abiding responsible citizens to use arms in defense of hearth and home," 554 U.S. at 634-39, the term "law-abiding" has spawned much discussion. Is a serial parking scofflaw "law-abiding"? Technically, is a driver with a single speeding violation law-abiding? Are misdemeanors to be forgiven when analyzing a citizen's law-abiding nature? *Rahimi* suggests that the real issue in disarming citizens is "dangerousness"—but *Rahimi* understandably focused on "dangerousness" as opposed to felon status (as *Rahimi* was not a felon). 144 S. Ct. at 1901 ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."). Moreover, in *Rahimi* the Supreme Court flatly rejected the "Government's contention that Rahimi may be disarmed simply because he is not

---

[11] There are respected historians and jurists who have reasoned that this clause was intended to protect militias rather than citizens' rights to be armed. *See Heller*, 597 U.S. at 655-59 (Stevens, J., dissenting); *see also* Stephen Breyer, *Reading the Constitution* 211 (2024). In light of *Heller*, *Bruen*, and *Rahimi* that ship has sailed.

'responsible.'" *Id.* at 1903. The Court brushed aside "responsible" as a "vague term" that simply does not comprise any part of the relevant test. *Id.*

Ginevan builds on this emphasis on "dangerousness" vis-à-vis felony status to argue that it is unconstitutional to deny all felons their right to bear arms. After all, there is a significant difference in gradations of "dangerousness" between a felony conviction for involuntary manslaughter by poor driving or a mail fraud conviction, as opposed to felony convictions for aggravated malicious wounding based upon shooting multiple victims. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (single mail fraud conviction); *Range v. AG United States*, 69 F.4th 96, 106 (3d Cir. 2023) (felony conviction for making false statement to obtain food stamps). Ginevan reasons that it is wrong to assume that anyone who crosses the boundary into felon status is not a member of "the people" under the text of the Second Amendment.

Here, we run headlong into the tension between *Heller*'s assurances that felon-in-possession laws are presumptively legal and the more restrictive prose of *Bruen* and *Rahimi*. On the one hand there is *Heller*'s promise that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," 554 U.S. at 626-27—language reiterated in both *McDonald*, 561 U.S. at 786, and *Rahimi*, 144 S. Ct. at 1902. *See also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring). On the other hand, *Bruen* admonishes that when "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. *Bruen* then concludes that the Second Amendment's plain text presumptively guarantees law-abiding citizens the right to bear arms in public for self-defense. *Id.* at 33. *Rahimi* further instructs that the Second Amendment right may be burdened "once a defendant has been found to pose a credible threat to the physical safety of others." 144 S. Ct. at 1902. Ginevan attempts to stake out the grey area where felons are not properly considered

"dangerous" or "violent" to topple Code § 18.2-308.2 and to fit within "the people" for textual purposes.

Others have crafted similar arguments; and it is not surprising, against this backdrop, to find a budding split in the circuits on the felon-in-possession question among the federal courts of appeals.[12] The question of whether non-dangerous felons can be stripped of their gun rights, however, is a debate into which we need not wade because Ginevan is not simply a felon—but has been adjudicated a *violent* felon by virtue of his previous 2018 conviction for possessing ammunition as a convicted felon in violation of Code § 18.2-308.2. *See* Code § 17.1-805(C).

At bottom, the analysis of whether "the people" covers felons or violent felons depends on perspective; some courts have applied the *Heller* "law-abiding" citizen language in an attempt to demarcate the category of citizens who possess the right, while others have focused on the Second Amendment's permissive language to authorize the right to bear arms, subject to the state's ultimate authority to regulate and deny the right.[13] The latter camp is gaining momentum.

---

[12] Since the decision in *Bruen* was released, seven of the thirteen federal courts of appeals have considered whether the federal analogue to Code § 18.2-308.2, 18 U.S.C. § 922(g)(1), violates the Second Amendment. 18 U.S.C. § 922(g)(1) makes it a crime for any person to possess a firearm if he has been convicted of an offense "punishable by imprisonment for a term exceeding one year." Five have upheld the statute—*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024); *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024); *United States v. Gay*, 98 F.4th 843, *rehearing en banc denied*, 2024 U.S. App. LEXIS 20559 (7th Cir. 2024); *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024); *United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024)—and two have held that the statute is unconstitutional as applied to people who have committed *non-violent* felonies—*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024); *Range*, 69 F.4th 96. The lack of consensus, however, often stems from analysis of the second prong of the *Bruen* test. Notably, none of these decisions hold that violent felons are denied constitutional rights through disarmament.

[13] As noted above, the "textual" question has led to much debate and disagreement. *Compare Diaz*, 116 F.4th at 466 ("The government also raises the familiar argument that Diaz is not among 'the people' protected by the Second Amendment. We disagree."); *Williams*, 113 F.4th at 649 ("On balance, the Second Amendment's plain text presumptively protects Williams's conduct . . . . Williams is a member of the people claiming 'the right' to possess a gun—to 'keep and bear arms.'" (quoting *Bruen*, 597 U.S. at 17; *Heller*, 554 U.S. at 582)), *with Dubois*, 94 F.4th at 1292 ("Felons are categorically 'disqualified' from exercising their Second

## 2. We will Assume, Without Deciding, that Ginevan Falls Within "the people" for Purposes of the First Prong of the *Bruen* Test

Even if Ginevan is considered part of "the people" for Second Amendment purposes, he still must prevail on the historical analysis to overthrow the statute. Because he cannot prevail on the historical test, the outcome is the same here whether he is—or is not—considered "the people" for Second Amendment purposes so we do not need to definitively resolve that question in this case. For purposes of the textual analysis, we note that many courts, following *Bruen*'s expansive language, 597 U.S. at 17, have concluded that felons *are* embraced within "the people" because the conduct of bearing arms for self-defense is plainly protected by the Second Amendment. *See supra*, nn. 12 & 13. While we will assume without deciding that Ginevan fits within "the people" for purposes of our analysis,[14] we observe that the Second Amendment offers "the people" the *right* to bear arms for self-protection but not a *blank check* to do so. As *Heller* proclaimed: "Like most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. The right can be forfeited or held in abeyance for individuals who attain a status that signals a danger of violence or threat to public safety.[15] This brings us to the second prong of the *Bruen* analysis.

---

Amendment right under *Heller*."); *Gay*, 98 F.4th at 847 (defendant is not a "law-abiding, responsible" person who has a constitutional right to possess firearms).

[14] *See Marlowe v. Sw. Va. Reg'l Jail Auth.*, 81 Va. App. 415, 424 n.5 (2024) (applying the doctrine of judicial restraint and deciding the case on the best and narrowest grounds available); *see also Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("The doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available.").

[15] For example, no one would suggest that a newborn has a right to sleep with a gun in their crib. If an infant were found in these circumstances, a report would rightly be filed with the local Department of Social Services. There is, admittedly, a sense of unease in suggesting that violent felons or the mentally ill are within "the people" for gun rights analysis. However, we stress that under the *Bruen* test, here, the analysis is not complete until both steps are weighed. Thus, *Bruen*'s broad suggestion that "the people" have the right to self-defense under the Second Amendment's "unqualified command," 597 U.S. at 17, does not necessarily mean that felons have the right to possess guns until the State seeks them out and disarms them; it means that if a

C. Even assuming, arguendo, that the Plain Text of the Second Amendment Covers Ginevan's Conduct, a Prohibition on Violent Felons Possessing Firearms is Consistent with Our Nation's Historical Tradition of Firearm Regulation, and the Commonwealth Met its Burden in Proving so in this Case

Under the second prong of the *Bruen* test, the burden is on the government to show that the gun prohibition it seeks to impose is consistent with the historical tradition of firearm regulation. 597 U.S. at 17. Here, the Commonwealth argues that "[t]he English tradition of disarming dangerous individuals who pose a threat to public safety dates back centuries." Indeed, the first known restrictions on firearm possession in England were instituted in 602 A.D. in the Laws of King Aethelbirht, the earliest surviving English legal code—making it illegal to "furnish weapons to another where there is strife." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 258 (2020) (quoting *Ancient Laws and Institutes of England* 3 (Benjamin Thorpe ed., 1840)). Over the next several centuries, dangerous persons were often disarmed according to the law. Dangerous people in those contexts most often meant "those involved in or sympathetic to rebellions and insurrections[.]" *Id.* Often, the government would prohibit firearm possession from entire regions or even religious sects suspected of disloyalty to the ruling class. *Id.*[16]

---

citizen passes the first prong of the analysis, we move to the second prong where history will generally step in to prevent violent felons from inflicting dangers upon society. Upon proper analysis legislatures are then free to bar violent felons from gun possession and to remain true to *Heller*'s assurances that infants and the mentally ill likely will not be armed either.

[16] We note, respectfully, that applying a largely historical test to legal matters is somewhat counterintuitive. As Justice Breyer observed in dissent in *Bruen*, judges are not historians, and many lawyers will be challenged in unearthing centuries old historical analogues to present as evidence. Moreover, the world—and weaponry—have changed much since the 1790's. *Bruen*, 597 U.S. at 107 (Breyer, J., dissenting). Other courts have pointed out that legal inconsistencies may be caused by divergent readings of historical events and inconsistent academic theories and evidentiary testimony. *See United States v. Hill*, 703 F. Supp. 3d 729, 748-50 (2023). Finally, as will be shown below, some of the history of the founders' restrictions on minority sects, races, and ethnicities make for uncomfortable "analogues" that plainly would prove to be unconstitutional today.

"The Second Amendment was adopted in 1791." *Bruen*, 597 U.S. at 34. It was made applicable to the states via the Fourteenth Amendment in 1868. *Id.*[17] The Commonwealth, nonetheless, for context—and consistent with *Bruen* and *Rahimi*—presents a broader narrative. For example, in the late 1600's, under England's Militia Acts, non-Anglican Protestants who declined to join the Church of England (as well as those who were considered dangerous) were disarmed. *United States v. Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024) (citing Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994); and the Militia Act of 1662, 13 & 14 Car. 2 c. 3 § 13)). Parliament eventually recognized a right for "good subjects" to own arms in the English Bill of Rights. *Id.* (quoting An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7 (1689)). But the Militia Act of 1662 nonetheless still authorized disarming those determined to be "dangerous to the Peace of the Kingdome." 12 Car. 2, c. 3 (Eng.). In the 1700's, statutes were passed prohibiting "'dangerous' individuals from possessing weapons." Comment, *Bruen and the Gun Rights of Pretrial Defendants*, 172 U. Pa. L. Rev. 1701, 1720 (2024). Indeed, "Constables were instructed to seize weapons from persons who were dangerous or 'Offensively Arm'd . . . upon Sight thereof[.]'" *Id.* (quoting Robert Gardiner, *The Compleat Constable* 18 (3d ed. 1708)). The Statute of Northampton likewise allowed for the disarming of those who carried weapons in a "terrify[ing]"— from the French word "affraier"—manner. *Rahimi*, 144 S. Ct. at 1901 (citing 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787)).

---

[17] *Bruen* stated that "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." 597 U.S. at 37. However, the decision further observed that ongoing scholarly debate leaves open reliance on 1868 when the Fourteenth Amendment was adopted, and the Bill of Rights readopted. *Id.* at 38. Ultimately, the Court concluded: "We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.*

The Commonwealth also pointed to laws enacted during the founding era of the United States, by which "Massachusetts and Pennsylvania confiscated weapons belonging to those who did not swear allegiance to the United States." A'ee Br. at 18 (quoting *Riley*, 635 F. Supp. at 427-28). Despite the "uniquely American tradition" of firearm use, the colonists continued the English tradition of disarming those perceived to be dangerous to government or society. Greenlee, 20 Wyo. L. Rev. at 261 (citing Charles Winthrop Sawyer, *Firearms in American History* 1 (1910)).

> [I]n 1692, Massachusetts authorized "every justice of the peace" to arrest "all affrayers, rioters, disturbers or breakers of the peace" who, "upon [the] view of such justice," "ride, or go armed offensively" or cause "fear or affray of their majesties liege people," and to "seize and take away his armour or weapons, and . . . cause them to be apprized and answered to the king as forfeited."

*United States v. Rowson*, 652 F. Supp. 3d 436, 467-68 (S.D.N.Y. 2023) (quoting Acts and Laws Passed by the Great and General Court of Assembly of Their Majesties Province of the Massachusetts-Bay, 2d Sess., 52-53 (1692)). Similarly, "[i]n 1759, New Hampshire enacted a substantially identical statute[.]" *Id.* (quoting Acts and Laws of His Majesty's Province of New-Hampshire in New-England 1-2 (1759)).

Virginia law was no exception to this practice. Virginia permitted constables to confiscate arms "from such who ride, or go, offensively armed, in Terror of the People." Greenlee, 20 Wyo. L. Rev. at 262 (quoting George Webb, *The Office of Authority of a Justice of Peace* 92-93 (1736)). Maryland, Virginia, and Pennsylvania also disarmed Catholics during the 1750's because they were viewed as a threat to the government. *Id.* at 263 (citing Nicholas Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights and Policy* 197 (2d ed. 2017)). And "[i]n 1776, the Continental Congress recommended that the colonies disarm persons 'who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies.'" *Id.* at 264 (quoting 1 Journals of the Continental Congress, 1774–1789, 285 (1906)). Several colonies, including Virginia, followed this

recommendation, providing the confiscated arms to the Continental Army. *Id.* at 265. During that time period, the enslaved and Native Americans were also thought to pose immediate threats to public safety and stability and were disarmed as a matter of course. *Id.* at 281 (citing Malcolm, *supra*, at 140-41). Indeed, at one point Virginia passed laws making it a capital offense to provide Native Americans with firearms.[18] *United States v. Williams*, 113 F.4th 637, 652 (6th Cir. 2024) (noting that Virginia "punished with death citizens caught providing arms to Native Americans").

The Commonwealth further demonstrates that following the Founding era, in the 1800's, states began enacting more extensive gun control legislation. Laws banned the possession of arms by juveniles, people with mental illnesses, and the homeless. For example, in Connecticut, individuals who were perceived as dangerous were disarmed, *id.* at 654, based on the advice of the Continental Congress to "secure every person, who, going at large, might in their opinion endanger the safety of the colony or liberties of America," *Folajtar v. AG of the United States,* 980 F.3d 897, 914 (3d Cir. 2020) (quoting G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Hist. Rev. 273, 281-82 (1899)). Such laws were routinely upheld by state supreme courts. *See, e.g.*, *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented "the mischief to be apprehended from an intoxicated person going abroad

---

[18] Given the Second Amendment's origin in 1791—although it was based on prior common law—the ratifying conventions and the Founding era generally are particularly instructive here. At one of the ratifying conventions for the Constitution, the Anti-Federalists proposed a bill that disallowed "disarming the people . . . unless for crimes committed, or real danger of public injury from individuals." *Rahimi*, 144 S. Ct. at 1936 (quoting *Heller*, 554 U.S. at 598). At the Massachusetts convention, Samuel Adams proposed an amendment that would have forbade "prevent[ing] the people of the United States, who are peaceable citizens, from keeping their own arms." *Id.* at 1935-36 (quoting 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000)). These proposals were particularly notable because they were "made by Anti-Federalists—those most suspicious of federal power"—and they "framed the right in more individualistic terms than the institutional militia context of other similar proposals," "[y]et even these proposals recognized that the right to keep and bear arms presumed an ability to enact reasonable limitations to protect public safety, including the disarmament of individuals perceived to be dangerous." *United States v. Rahimi*, Brief for Amici Curiae Professors of History and Law in Support of Petitioner 7 (2023) (emphasis omitted).

with fire-arms"); *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900) (finding that a law disarming "tramps" constitutional because the right to keep and bear arms "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others").

In sum, the historical record leading up to, contemporaneous with, and following the adoption of the Second Amendment, and the Fourteenth Amendment, demonstrates that the English and American tradition of those timeframes was to disarm people who were viewed as dangerous to the public or the stability of government.[19]

Ginevan is quick to point out that there were no outright gun bans based on felony status at the time of the Founding.[20] Moreover, he is correct that the federal law prohibiting felons from possessing firearms was not enacted until 1961. An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). The Firearms Act of 1938, the precursor to the current act, limited disarmament to felons convicted of murder, rape, kidnapping and burglary. Federal Firearms Act, ch. 850, § 1(6), 52 Stat. 1250, 1251 (1938). For that matter, the same is true

---

[19] The amicus brief filed by historians in the *Rahimi* case fleshed out this view:

> There is a longstanding American tradition of regulating firearms possession by people who are perceived to be dangerous or otherwise threaten to disrupt the public peace. The tradition of curtailing the right to keep and bear arms of those perceived as threats to public safety and peace dates back to the common law, and continued through the colonial and Founding Eras. In some cases, dangerousness was evidenced by acts of violence, such as those who participated in Shays' Rebellion. But actual violence was not a prerequisite to disarmament; the perceived potential for violence to others or disruption to the social order was enough.

*United States v. Rahimi*, Brief for Amici Curiae Professors of History and Law in Support of Petitioner 2 (2023).

[20] *See Kanter*, 919 F.3d at 454 (Barrett, J. dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws.").

in Virginia; Code § 18.2-308.2 initially barred gun possession for individuals who had been convicted of specific, violent felonies from obtaining guns. In 1989, the General Assembly amended Code § 18.2-308.2 to prohibit any felon from possessing a firearm. *Parham v. Commonwealth*, No. 2876-95-2, slip op. at 2 (Va. Ct. App. Dec. 3, 1996). These timeframes come long after 1791 and 1868—the dates *Bruen* suggests are most instructive. 597 U.S. at 37-38. But Ginevan's argument focuses on isolated trees—albeit solid ones—rather than the full forest.

A review of English history, the American period prior to the Founding, and our post-civil war era demonstrates persuasively that restrictions on gun possession were broadly permitted against those who were judged to pose a danger to the public. And it is important to note that *Bruen* does not require a "historical twin" in order to permit governmental restrictions—only a historical analogue. 597 U.S. at 30. The disarming of those who posed a threat of violence to others is the historical analogue here.[21] *See Jackson*, 110 F.4th at 1126 (finding that laws disarming the dangerous around the time of the Founding provided a sufficient historical analogue to support the constitutionality of § 922(g)(1)). This is because the "how" and "why" of the original restrictions is the same. *Bruen*, 597 U.S. at 29. Both the founding-era disarmament laws and Code § 18.2-308.2 serve to block firearm possession by individuals considered to be dangerous.

Applying that analysis here, we affirm the lower court's finding that Code § 18.2-308.2 does not violate the Second Amendment and that Ginevan's rights were not violated when the statute was applied to him—as a violent felon. In Virginia, "[a]n appellant can only mount a successful facial challenge to a statute by showing first that the statute in question is unconstitutional as applied to

_____

[21] Also, it is somewhat illogical to expect restrictions based on felony status at the Founding because there was no need to disarm felons in early America, as felons generally would have been punished by death or been considered "civilly dead," losing all of their legal rights, anyway. *See, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."); *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983).

him and that the statute in question would not be constitutional in any context." *Toghill v. Commonwealth*, 289 Va. 220, 228 (2015). The historical record proves that, under the *Bruen* test, the government may prohibit people convicted of violent felonies from possessing firearms in accordance with the Second Amendment.

Ginevan attempts to argue that his 2018 conviction for possessing ammunition should not be considered a violent felony; but the legislature has spoken definitively on this issue in Code § 17.1-805(C), delineating "any felony violation of . . . § 18.2-308.2" as a "violent felony offense[.]" *See Butler v. Stegmaier*, 77 Va. App. 115, 134-35 (2023) ("Ultimately, it is the role of the General Assembly to evaluate and adopt or discard particular public policy changes as the elected representatives of Virginia directly accountable to the citizenry."). The Commonwealth has satisfied its burden of proving that Code § 18.2-308.2, as applied to Ginevan, meets the rigors of the Constitution and our legal tradition.

## CONCLUSION

Having applied the *Bruen* test to Code § 18.2-308.2 and its application to Ginevan in this case, we find that the Second Amendment does not prohibit the government from disarming Ginevan, a violent felon. The Commonwealth has met its burden of proving that Code § 18.2-308.2 "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 34. Thus, we affirm the circuit court's ruling denying Ginevan's motion to dismiss the indictment.

*Affirmed*.